1

2

3

4       UNITED STATES DISTRICT COURT
        WESTERN DISTRICT OF WASHINGTON
5                  AT SEATTLE

6   G3 GENUINE GUIDE GEAR INC.,

7                  Plaintiff,

8         v.                                    C15-561 TSZ

9   MARKER DEUTSCHLAND GMBH,                     ORDER
    et al.,
10

                   Defendants.
11

12         THIS MATTER comes before the Court pursuant to _Markman v. Westview_

13  _Instruments, Inc._, 52 F.3d 967 (Fed. Cir. 1995), to construe certain terms in U.S. Patent

14  No. 8,746,728 B2 ("the '728 Patent"), which discloses a heel unit for alpine ski bindings.

15  Having reviewed the parties' briefs and all other papers filed in connection with claim

16  construction, and having heard the arguments of counsel, the Court enters the following

17  order.

18  **Background**

19         Alpine skiing or touring involves both downhill and uphill travel on skis.  When

20  an individual is skiing downhill, both the toes and the heels of his or her alpine ski boots

21  are connected to the skis.  In contrast, when an individual is ascending or touring, only

22  the toes of his or her boots remain pivotally engaged with the skis; the heels are able to

23

1   move up and down with respect to the skis.  The invention disclosed in the '728 Patent is

2   an apparatus that can transition between (i) holding a ski boot heel onto an alpine ski for

3   downhill travel, and (ii) releasing the heel for touring use of the ski.

4       For safety reasons, alpine touring bindings are designed to release the ski boots in

5   the event that the user falls while skiing downhill.  In addition, when a ski boot detaches

6   from a ski while the heel binding is in the downhill mode, brake arms that are attached to

7   the ski will automatically deploy into the snow.  Automatic deployment of these brake

8   arms, however, is neither necessary nor desired when the skis are being used in ascent or

9   touring mode.  The '728 Patent discloses an apparatus that can transition between

10   (i) locking the brake arms in a raised position (away from the snow) during the touring

11   mode, and (ii) allowing automatic deployment of the brake arms in the event of a fall

12   while traveling downhill.

13       Plaintiff G3 Genuine Guide Gear Inc. is the assignee of the '728 Patent.  Plaintiff

14   manufactures and markets the "Onyx" brand of alpine ski bindings, which include both a

15   toe and a heel unit.  The toe unit is not at issue in this litigation.  In this action, plaintiff

16   alleges that defendants Marker Deutschland GmbH and Marker Volkl USA, Inc., which

17   make and/or sell the "Marker Kingpin" brand of alpine ski bindings, are infringing

18   independent Claims 1, 11, and 29, and dependent Claims 2, 12, 13, 18, 19, 32, 33, 35, 37,

19   38, and 39 of the '728 Patent.  _See_ Ex. B to Am. Compl. (docket no. 15-2 at 3); _see also_

20   Pla.'s Infringement Contentions (docket no. 25).  The four terms (or phrases) that the

21   parties ask the Court to construe are each set forth in at least one of the three independent

22   claims at issue, Claims 1, 11, and 29.

23

ORDER - 2

Claims 1, 11, and 29 of the '728 Patent are similar, but they differ in a few important ways. Claim 1 discloses an "apparatus for selectively holding a footwear heel to a snow travel aid," '728 Patent at Col. 15, Lines 47-48, whereas Claims 11 and 29 disclose a "binding kit" comprising either (i) "toe and heel units for holding footwear to a snow travel aid," _id._ at Col. 17, Lines 17-18, or (ii) "toe holding and heel holding units for holding footwear to a snow travel aid," _id._ at Col. 18, Lines 63-64. As indicated in the '728 Patent, in this context, "footwear" is typically a ski boot, and a "snow travel aid" is usually a ski. _Id._ at Col 2, Lines 57-58. The main difference between Claim 1, on the one hand, and Claims 11 and 29, on the other hand, involves the scope of the invention, with Claim 1 focusing on solely the heel, while Claims 11 and 29 describe binding kits having both toe and heel units.

The heel unit disclosed in Claim 1 has five primary components: (i) a "base" mountable to the ski; (ii) an "upper portion" that is "slidably engageable with the base" for "controllable movement" by the user into a downhill or a touring position; (iii) a "connector" for "connecting the apparatus to the heel" of the ski boot; (iv) a "brake" that is "moveable between a braking position whereby the brake is positioned to contact snow and a raised position whereby the brake would be positioned above the snow," and (v) a "brake holder" that is "moveable in response to movement of the upper portion between the downhill and touring positions" and that holds the brake "in the raised position when the upper portion is in the touring position." _See_ '728 Patent at Col. 15, Lines 49-67. The downhill and touring positions are defined as follows: (i) in the downhill position, "the connector would be connected to the heel," and (ii) in the touring position, which is

1  "spaced rearwardly from the downhill position," the connector "would be disconnected

2  from the heel." _Id._ at Col. 15 at 55-59.  Claim 1 also requires that "single motions of a

3  lever in opposite directions result in complete movement in opposite directions between

4  the downhill and touring positions." _Id._ at Col. 15, Line 67 – Col. 16, Line 2.

5       The heel units disclosed in Claims 11 and 29 are similar to the heel unit described

6  in Claim 1 with two exceptions:  (i) Claims 11 and 29 do not include the "brake" and

7  "brake holder" limitations of Claim 1; and (ii) unlike Claim 1, Claims 11 and 29 contain

8  the additional limitation that "complete movement in at least one direction between the

9  downhill and touring positions is actuated by a single motion of an actuator." _Id._ at

10  Col. 17, Lines 34-36 & Col. 19, Lines 16-18.  Claim 11 indicates that the "actuator" is a

11  "lever," and has language similar to Claim 1 requiring that "single motions of the lever in

12  opposite directions" must "result in complete movement in opposite directions between

13  the downhill and touring positions." _Id._ at Col. 17, Lines 37-40.  In contrast, Claim 29

14  does not dictate that the actuator be a lever or that "single motions . . . result in complete

15  movement." _See id._ at Col. 18, Line 63 – Col. 19, Line 18.

16       The parties disagree about the interpretation of four terms:  (i) the phrases in

17  Claims 1, 11, and 29 that define, in slightly different ways, the "upper portion," which is

18  "slidably engageable with the base for controllable movement" between the downhill and

19  touring positions; (ii) the limitation in Claims 1 and 11 that "single motions" in "opposite

20  directions" of a lever or actuator "result in complete movement" between the downhill

21  and touring positions; (iii) the limitation in Claims 11 and 29 that "complete movement in

22  at least one direction between the downhill and touring positions is actuated by a single

23

ORDER - 4

1   motion" of a lever or actuator; and (iv) the language in Claim 1 describing the "brake

2   holder."  Neither party asserts that any of the words used in the disputed claim terms have

3   other than their ordinary or plain meaning.  Indeed, the terms are straightforward and

4   easily understood to mean what they say.  With regard to the first three terms at issue,

5   however, defendants contend that the additional words "when [or while] footwear is

6   attached to the upper portion" must be imported into the claim.  With regard to the fourth

7   disputed term, defendants seek to include as a limitation that the brake holder must

8   transition between downhill and touring positions "without two-handed or dual motion

9   activity on the part of a user."

10   **Discussion**

11   **A.    Claim Construction Standards**

12         The Court has both the authority and the obligation to construe as a matter of law

13   the meaning of language used in a patent claim.  _Markman_, 52 F.3d at 979.  In doing so,

14   the Court must consider the intrinsic evidence in the record, meaning the claims, the

15   specification, and the prosecution history.  _Id._  The words of a claim are generally

16   assigned their "ordinary and customary meaning."  _Phillips v. AWH Corp._, 415 F.3d

17   1303, 1312 (Fed. Cir. 2005).  The ordinary and customary meaning of a claim term is the

18   definition ascribed to it by "a person of ordinary skill in the art in question at the time of

19   the invention."  _Id._ at 1313.  The context in which a claim term is used may also be

20   instructive.  _Id._ at 1314.  For example, if a claim refers to "steel baffles," the language

21   implies that baffles are not necessarily made of steel.  _Id._  The other claims of a patent

22   may also illuminate the meaning of a term, through _inter alia_ consistent usage of the

23

same term, or inclusion in a dependent claim of an additional term not present in the related independent claim. *Id.* at 1314-15.

Claims must also be read in light of the specification. *Markman*, 52 F.3d at 979. The specification is "the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315. If the specification reveals a definition given to a claim term that differs from the meaning it would otherwise possess, the inventor's lexicography trumps the ordinary and customary, or dictionary, construction. *Id.* at 1316. In considering the specification, however, the Court must take care not to import limitations from the specification into the claims. *Id.* at 1323. The Federal Circuit has "repeatedly warned" against confining the claims of a patent to the specific embodiments described in the specification. *Id.*

Similar to the specification, the prosecution history evidences how the inventor understood the terms used in the patent. *Id.* at 1317. Because the prosecution history, however, represents the "ongoing negotiation" between the United States Patent and Trademark Office and the applicant, it might suffer from a lack of clarity and is often less useful for claim construction purposes than the specification. *Id.* In addition, although the prosecution history "can and should be used to understand the language used in the claims," it may not itself "enlarge, diminish, or vary" the limitations in the claims. *Markman*, 52 F.3d at 980.

The Court may, in its discretion, consider extrinsic evidence as an aid in deriving the "true meaning" of the language employed in the patent. *Id.* (quoting *Seymour v. Osborne*, 78 U.S. 516, 546 (1870)). Extrinsic evidence may include expert or inventor

testimony, dictionaries, and learned treatises.  *Id.*  Extrinsic evidence is generally less

reliable than intrinsic evidence in construing the claim terms, and the Court must assess

such evidence accordingly, bearing in mind the flaws inherent in each type of extrinsic

evidence.  *See* *Phillips*, 415 F.3d at 1318-19.  Moreover, extrinsic evidence may not be

used to vary or contradict the terms of the claims in the patent.  *Markman*, 52 F.3d at 981.

**B.**     **Disputed Claim Terms**

    **1.**     **When/While Footwear is Attached**

According to defendants, the phrase "when/while footwear is attached to the upper

portion" should be read into at least two terms in each of the three independent claims at

issue, namely:  (i) the "upper portion" terms of Claims 1, 11, and 29; (ii) the "complete

movement" terms of Claims 11 and 29; and (iii) the "single motions" terms of Claims 1

and 11.  The language that defendants seek to add is highlighted in the following chart.

| TERM | Claim 1 | Claim 11 | Claim 29 |
|---|---|---|---|
| UPPER PORTION | wherein, **when footwear is attached to the upper portion,** the upper portion is slidably engageable with the base for controllable movement by a user of the upper portion relative to the base into:<br>   (i) a downhill position whereby the connector would be connected to the heel, and<br>   (ii) a touring position spaced rearwardly from the downhill position whereby the connector would be disconnected from the heel; | wherein, **when footwear is attached to the upper portion,** the upper portion is slidably engageable with the base for controllable movement by a user of the upper portion relative to the base into:<br>   (i) a downhill position whereby the connector would be connected to the footwear heel, and<br>   (ii) a touring position spaced rearwardly from the downhill position whereby the connector would be disconnected from the footwear heel; | wherein, **when footwear is attached to the upper portion,** the upper portion is slidably engageable with the base for controllable movement of the upper portion relative to the base into:<br>   (i) a downhill position whereby the connector would be connected to the footwear heel while the footwear toe is gripped by the toe unit, and<br>   (ii) a touring position spaced rearward from the downhill position whereby the connector would be disconnected from the footwear heel while the footwear toe is gripped by the toe unit; |

| TERM | Claim 1 | Claim 11 | Claim 29 |
|---|---|---|---|
| COMPLETE MOVEMENT | N/A | wherein complete movement in at least one direction between the downhill and touring positions is actuated by a single motion of an actuator**, while footwear is attached to the upper portion**; and | wherein complete movement in at least one direction between the downhill and touring positions is actuated by a single motion of an actuator**, while footwear is attached to the upper portion**. |
| SINGLE MOTIONS | . . . and wherein single motions of a lever in opposite directions, **while footwear is attached to the upper portion,** result in complete movement in opposite directions between the downhill and touring positions. | wherein the actuator is a lever and single motions of the lever in opposite directions**, while footwear is attached to the upper portion,** result in complete movement in opposite directions between the downhill and touring positions. | N/A |

Defendants advance three theories for why the phrase "when/while footwear is attached to the upper portion" should be included in the claim terms at issue:  (i) the context of the claim terms requires such reading; (ii) the '728 Patent's disparagement of the prior art supports such interpretation; and (iii) a disclaimer allegedly reflected in the prosecution history warrants importing such limitation.  Defendants' arguments lack merit.

### a.      Context of Claim Terms

Defendants assert that, in defining the downhill and touring positions as connected to the heel and not connected to the heel, respectively, the "upper portion" claim terms require that a boot be attached to the binding.  This contention ignores the fact that Claim 1 discloses only a heel apparatus, which is necessarily not connected to the heel of the footwear while in the touring position.[1]  To construe the "upper portion" claim term

---

[1] Defendants rely on the specification's discussion of "some embodiments," in which a "lever that actuates translation of the heel unit does so in a single motion or 'throw,'" _see_ '728 Patent at Col. 4, Lines 62-63, but the passage defendants quote, which is focused on the lever, and not on the footwear, does not

ORDER - 8

as calling for the boot to be attached while at the same time not connected would render Claim 1 nonsensical.

Defendants further argue that the '728 Patent's repeated use of the phrases "by a user" and "by the user," as in the Abstract's statement that the "upper portion is slidably engageable with the base for movement *by a user* into a downhill position and a touring position spaced rearwardly from the downhill position," Ex. A to Am. Compl. (docket no. 15-1 at 2) (emphasis added), connotes that, during the conversion from downhill to touring mode, a person must be wearing footwear attached to the binding. In focusing on the user, defendants confuse the invention claimed in the '728 Patent with its operation. The '728 Patent discloses an apparatus, not a method of use, and notably, of the more than 25 figures in the specification, the few that contain a ski boot, and thereby indirectly refer to a user, concern solely the prior art, and not the invention. Defendants' analysis is also overbroad, failing to distinguish between the footwear and its components. The heel of the footwear is by definition disconnected from the binding when the upper portion is in touring mode; only the toe of the footwear is envisioned by Claims 11 and 29 (but not by Claim 1) to remain gripped by the toe unit.

To the extent defendants instead meant to suggest that the toe of the footwear, rather than the entire ski boot, must be attached to the upper portion during the transition between downhill and touring positions, any such language would be merely duplicative.

---

support, and in fact contradicts, their suggestion that the footwear must remain attached; it explicitly contemplates that the "projections of the heel unit" will be "fully disengaged from the heel in the touring mode," *id.* at Col. 4, Line 65 – Col. 5, Line 1.

ORDER - 9

1    In its preamble, Claim 11 already requires that the toe unit be "configured to grip the

2    footwear at only the footwear toe to retain the footwear on the snow travel aid

3    independent of the heel unit." _See_ '728 Patent at Col. 17, Lines 17-22; _see also Proveris_

4    _Scientific Corp. v. Innovasystems, Inc._, 739 F.3d 1367, 1372 (Fed. Cir. 2014) ("A

5    preamble is generally construed to be limiting if it 'recites essential structure or steps, or

6    if it is necessary to give life, meaning, and vitality to the claim.'").  Similarly, Claim 29

7    explicitly describes the upper portion as "slidably engageable . . . into:  (i) a downhill

8    position whereby the connector would be connected to the footwear heel _while the_

9    _footwear toe is gripped by the toe unit_, and (ii) a touring position . . . whereby the

10    connector would be disconnected from the footwear heel _while the footwear toe is_

11    _gripped by the toe unit_." _See_ '728 Patent at Col. 19, Lines 6-15 (emphasis added).  Thus,

12    defendants' additional verbiage is simply superfluous.

13        Defendants' position also ignores the tense of the verbs used in the "upper

14    portion" terms of Claims 1, 11, and 29.  In all three independent claims, the patentee used

15    the auxiliary "would" with the infinitive verb "be" to convey a hypothetical meaning, as

16    in "a downhill position whereby the connector _would be_ connected to the heel" and

17    "a touring position . . . whereby the connector _would be_ disconnected from the heel."

18    '728 Patent at Col. 15, Lines 55-59 (emphasis added); _see also id._ at Col. 17, Lines 29-

19    33; _id._ at Col. 19, Lines 9-15.  This phrasing is actually a truncated conditional sentence,

20    properly understood as indicating that, if the heel unit were in the downhill position, the

21    connector would be connected to the heel, whereas, if the heel unit were in the touring

22    position, the connector would not be connected to the heel.  _See_ Webster's 3d New Int'l

23

ORDER - 10

Dictionary 2638 (1981) (defining "would" as "used in auxiliary function in the

conclusion of a conditional sentence to express a contingency or possibility ‹if he were

coming, he ~ be here now›"); *see also* RANDOLPH QUIRK ET AL., A COMPREHENSIVE

GRAMMAR OF THE ENGLISH LANGUAGE § 4.64, at 234 (1985) ("*Would* (and sometimes,

with a 1st person subject, *should*) may express hypothetical meaning in main clauses:

If you pressed that button, the engine *would* stop.  If there were an accident, we

*would/should* have to report it." (emphasis in original)).  The user, however, need not be

in the footwear, and the footwear need not be attached to the upper portion, for the heel

unit to be in either the downhill or touring position.

      Contrary to defendants' contention, construing the words "would be" as signifying

a possible status of the upper portion does not render meaningless the phrases in which

they appear, which each begin with "whereby."  Defendants suggest that, absent their

proposed requirement that the ski boot be attached during translation between downhill

and touring modes, the "upper portion" terms of the claims at issue would be effectively

truncated as follows:

> wherein the upper portion is slidably engageable with the base for
> controllable movement by a user of the upper portion relative to the base
> into:
>   (i) a ~~downhill~~ forward position ~~whereby the connector would be connected
> to the heel~~, and
>   (ii) a ~~touring~~ rearward position spaced rearwardly from the ~~downhill~~
> forward position ~~whereby the connector would be disconnected from the
> heel~~ . . . .

*See* Defs.' Brief at 16 (docket no. 19) (alterations in original).  Defendants' reasoning is

flawed.  Regardless of whether the positions are called "forward" and "rearward" or

ORDER - 11

"downhill" and "touring," the conditions associated with the positions still apply.  The positions are defined by whether the heel of the footwear, if present, would or would not be connected, but the boot need not actually be on the ski for the different positions to be achieved.

### b.   Disparagement of Prior Art

In support of their argument that the limitation "when/while footwear is attached to the upper portion" must be read into at least two of the terms of Claims 1, 11, and 29, defendants cite the background section of the specification, which describes the manner in which the prior art, namely alpine touring bindings sold under the brand DYNAFIT, transitioned between the downhill and touring positions:

> To switch between touring and downhill modes with the DYNAFIT[TM] system, it is necessary to rotate the heel unit so that the pins either engage the footwear heel (downhill mode) or face away from the heel (touring mode).  When the pins are facing away, the footwear heel is free to move upward and downward. . . .  In order to switch from downhill mode to touring mode it is necessary to either forcibly release the pins from the fitting on the heel (not recommended) or disengage the toe unit from the footwear, so that the footwear completely exits from the binding system whereupon the heel unit may be rotated to a position in the touring mode. This can be difficult to do in deep snow or on steep slopes.

'728 Patent at Col. 2, Lines 12-28.  Defendants contend that this passage manifests the patentee's intent to disavow operation of the invention, *i.e.*, movement between downhill and touring positions, without the footwear attached, relying primarily on *Openwave Sys., Inc. v. Apple Inc.*, 808 F.3d 509 (Fed. Cir. 2015).

*Openwave* teaches that an inventor may disavow claim scope by disparaging a particular feature or embodiment.  *Id.* at 513; *see also SciMed Life Sys., Inc. v. Advanced*

1    *Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001) (when the specification

2    "makes clear that the invention does not include a particular feature, that feature is

3    deemed to be outside the reach of the claims of the patent").  *Openwave*, however, also

4    makes clear that the standard for disavowal of claim scope is "exacting."  808 F.3d at

5    513; *see also* *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir.

6    2012).  To deem a particular feature or embodiment disavowed, the Court must conclude

7    that the specification is "both so clear as to show reasonable clarity and deliberateness,

8    and so unmistakable as to be unambiguous evidence of disclaimer."  *Openwave*, 808 F.3d

9    at 513.  Mere criticism of a particular embodiment encompassed by the plain meaning of

10   a claim term is not sufficient to constitute disavowal.  *Thorner*, 669 F.3d at 1366.  Rather,

11   disavowal via disparagement requires that the specification go "well beyond expressing

12   the patentee's preference" and contain derogatory statements about a particular feature or

13   embodiment that "reasonably may be viewed as a disavowal."  *Openwave*, 808 F.3d at

14   513.

15          The language in the specification of the '728 Patent on which defendants rely does

16   not even come close to meeting these standards.  The statement that converting the

17   DYNAFIT system from downhill to touring mode "can be difficult" in certain situations

18   does not indicate a preference, let alone rise to the level of disavowing transitions

19   between downhill and touring positions without the footwear being attached to the skis.

20

21

22

23

1   Moreover, unlike in *Openwave*[2] or *SciMed*,[3] in this case, defendants point to no word or

2   phrase actually appearing in Claims 1, 11, or 29 that must be interpreted in light of the

3   alleged disparagement of the prior art.  *See SciMed*, 242 F.3d at 1344 (claim construction

4   "begins and ends in all cases with the actual words of the claim" (quoting *Renishaw plc v.*

5   *Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998))).  Rather, defendants

6   are improperly attempting to import into the claims at issue an additional limitation that is

7   based on the specification's description of the prior art.  *See Thorner*, 669 F.3d at 1366

8   ("We do not read limitations from the specification into claims; we do not redefine

9   words.").  Defendants have crossed the line between "using the specification to interpret

10   the meaning of a claim and importing limitations from the specification into the claim."

11   *See Phillips*, 415 F.3d at 1323.

12   _____

13   [2] *Openwave* involved three patents, each setting forth a method and architecture for an interactive two-
way data communication network.  One of the patents used the claim term "mobile device," another
14   contained the claim term "wireless mobile telephone," and the remaining patent employed the claim term
"two-way communication device."  808 F.3d at 511.  The issue in *Openwave* was whether these claim
15   terms should be assigned their "ordinary meaning" or whether, because of repeated disparagement in the
specification of prior art "intelligent devices," the claim terms should be interpreted not to include mobile
devices containing "computer modules."  *Id.* at 511-12.  At the time of the invention in 1995, "intelligent
16   devices" could not be updated without physically changing the devices themselves, were large in size,
expensive to produce, had problems with battery life, and did not have sufficiently powerful processors.
*Id.* at 512.  The patentee devised a way of dividing the computing power between a mobile device and a
17   remote server, thereby eliminating the need for the mobile device to have full computing capacity.  *Id.*  In
the specifications, the patents indicated that a cellular telephone was "not a combination of a computer
18   module and a wireless communication module as in prior art attempts to create an intelligent telephone"
and that a cellular telephone used "only a microcontroller" and did not require "a separate computer
module as in the prior art."  *Id.* at 514.  The specifications were "rife with remarks that disparage and,
19   therefore, disclaim mobile devices that incorporate computer modules," and the Federal Circuit affirmed
the district court's conclusion that the claim terms excluded devices employing "computer modules," but
20   not those incorporating "microprocessors."  *Id.* at 514 & 517.

21   [3] In *SciMed*, which involved two types of catheters in the prior art, namely dual lumens or coaxial lumens,
the Federal Circuit held that the patentee disavowed dual-lumen configurations by disparaging them in the
22   specification and by repeatedly describing the present invention as using the coaxial design.  242 F.3d at
1340-45.

23

ORDER - 14

1

          **c.**    <u>**Disclaimer in Prosecution History**</u>

2

      An inventor may also disavow claim scope by disclaiming it while prosecuting the

3 patent.  *See* <u>*Springs Window Fashions LP v. Novo Indus., L.P.*</u>, 323 F.3d 989, 994 (Fed.

4 Cir. 2003) ("the prosecution history limits the interpretation of claim terms so as to

5 exclude any interpretation that was disclaimed during prosecution").  Arguments made

6 during prosecution to overcome prior art must be considered when construing the claims

7 of a patent in order to protect the public's right to rely on such statements.  <u>*Rheox, Inc. v.*</u>

8 <u>*Entact, Inc.*</u>, 276 F.3d 1319, 1325 (Fed. Cir. 2002); <u>*see also*</u> <u>*Omega Eng'g, Inc. v. Raytek*</u>

9 <u>*Corp.*</u>, 334 F.3d 1314, 1324 (Fed. Cir. 2003); <u>*Springs Window*</u>, 323 F.3d at 995 ("The

10 public notice function of a patent and its prosecution history requires that a patentee be

11 held to what he declares during the prosecution of his patent.").  Nevertheless, the

12 standard for prosecution history estoppel is a "high one."  <u>*Avid Tech., Inc. v. Harmonic,*</u>

13 <u>*Inc.*</u>, 812 F.3d 1040, 1045 (Fed. Cir. 2016).

14

      For a disclaimer to attach, the allegedly "disavowing actions or statements made

15 during prosecution [must] be both clear and unmistakable."  <u>*Id.*</u>; <u>*see also*</u> <u>*Springs*</u>

16 <u>*Window*</u>, 323 F.3d at 994 (indicating that a disclaimer "must be effected with 'reasonable

17 clarity and deliberateness'").  If the prosecution history is merely vague, ambiguous, or

18 "amenable to multiple reasonable interpretations," the Court must refrain from narrowing

19 the claim scope on prosecution disclaimer grounds.  <u>*Avid*</u>, 812 F.3d at 1045; <u>*see*</u> <u>*Omega*</u>,

20 334 F.3d at 1324 (indicating that the Federal Circuit has "declined to apply the doctrine

21 of prosecution disclaimer where the alleged disavowal of claim scope is ambiguous," but

22

23

ORDER - 15

when the patentee "has unequivocally disavowed a certain meaning to obtain his patent," the claims will be interpreted in a manner "congruent with the scope of the surrender").

Defendants suggest that, in a November 2013 response to non-final office action, the patentee disclaimed transitioning between downhill and touring positions without the footwear attached.  In the November 2013 response, Claim 1 was amended to include the limitation "wherein single motions of a lever in opposite directions result in complete movement in opposite directions between the downhill and touring positions."  Ex. 2 to Defs.' Brief (docket no. 19-2 at 3).  Former Claim 41, which became Claim 11, was also amended to include this same limitation.  *Id.* (docket no. 19-2 at 6).  Moreover, a new claim, identified as Claim 65 and later renumbered as Claim 29, was proposed, with the following explanation:

> [W]e submit that the additional features recited in enclosed claim 65 will avoid these Examiner's allegations because Schiele et al. is not applicable in the manner suggested by the Examiner.  The Examiner alleges that Schiele et al. discloses a toe unit configured to grip the footwear at only the footwear toe to retain the footwear on the snow travel aid independent of the heel unit while permitting forward and rearward pivoting. . . .  However, Schiele et al. does not disclose a toe unit that is configured to grip footwear at only the footwear toe and retain the footwear on the snow travel aid independent of the heel while permitting forward and rearward pivoting. . . .  The portions identified by the Examiner as toe and heel units in the device of Schiele et al. *translate forward or rearward together, as a single unit*. . . .  The cited references contain no suggestion that with such a toe heel unit combination, one can make use of rearward translation of the heel unit to disconnect the heel unit while the toe continues to grip the footwear to allow for touring.

*Id.* (docket no. 19-2 at 14-15) (emphasis added).

Nothing in the prosecution history cited by defendants indicates that the footwear must remain attached to the upper portion during the transition between downhill and

1    touring modes.  Rather, the amendments to Claims 1 and 11 (née 41) required only that

2    "single motions of a lever in opposite directions" accomplish complete movement

3    between the downhill and touring positions.  This language does not require that the

4    footwear be attached to the upper portion for the lever to switch back and forth and

5    satisfy the claim limitation.  With regard to the clarification concerning the prior art

6    (Schiele et al.), to the extent defendants contend the patentee's statements narrowed the

7    scope of Claims 1 and 11, their argument ignores the context of such statements.  The

8    patentee's comments pertained only to the new claim originally denominated as

9    Claim 65, which became Claim 29, and thus, they provide no basis for importing into

10   Claims 1 and 11 the proposed "when/while footwear is attached to the upper portion"

11   limitation.

12          As to Claim 29, the above-quoted material regarding the prior art merely explains

13   that, contrary to the Examiner's belief, the Schiele patent does not disclose a toe unit that

14   would retain the toe of the footwear on the snow travel aid independent of the heel, but

15   instead involves toe and heel units that move forward and backward in tandem.  The

16   Schiele invention is therefore distinguishable because the '728 Patent describes a heel

17   unit that moves forward and backward with respect to the toe unit.  This difference

18   between the prior art and the invention at issue would exist regardless of whether the

19   footwear was attached to the snow travel aid.  Defendants simply have not offered, in

20   support of their proposed claim term constructions, the type of "clear and unmistakable"

21   or "reasonably clear and deliberate" statements that reflect an "unequivocal disavowal"

22   of claim scope.

23

1

2.      **Brake Holder**

2

The following diagrams from the '728 Patent depict the heel unit of Claim 1, with

3

integral snow brake, in both downhill and touring configurations:

4

5



6

7

8

9

10

11

'728 Patent at Figs. 20B & 22B.  The drawing on the left shows the downhill mode, in

12

which, in the absence of a ski boot, the brake platform (61) is elevated, and the brakes

13

(62) are in the deployed position.  In the figure on the right, the brake platform (61) is

14

latched and the brakes (62) are locked in the raised position to allow for ascent or touring.

15

To lock the brakes in the raised position for touring, downward pressure must be

16

applied to the brake platform after the heel unit has been transitioned to the touring mode.

17

Defendants assert that, because this extra step of pushing down on the brake platform is

18

required, the brake holder does not switch from downhill to touring mode automatically.

19

Defendants further postulate that, if a user applied the necessary downward force to the

20

brake platform with his or her hands, as opposed to his or her ski boot, the brake holder

21

of the '728 Patent would not be novel over the prior art.  Thus, with respect to the "brake

22

23

ORDER - 18

holder" term of Claim 1, defendants propose three alterations:  (i) substitute "with" for

"in response to movement of"; (ii) substitute "to hold" for "the break holder for holding";

and (iii) add the phrase "without two-handed or dual motion activity on the part of a user

when transitioning between downhill and touring positions."  These suggested changes

are highlighted in the following chart.

| TERM | Claim 1 | Defendants' Proposed Construction |
|---|---|---|
| BRAKE HOLDER | a brake holder moveable in response to movement of the upper portion between the downhill and touring positions, the brake holder for holding the brake in the raised position when the upper portion is in the touring position | a brake holder moveable **with** the upper portion between the downhill and touring positions, **to hold** the brake in the raised position when the upper portion is in the touring position **without two-handed or dual motion activity on the part of a user when transitioning between downhill and touring positions** |

Defendants' views stem from a misunderstanding about the apparatus disclosed in

Claim 1 of the '728 Patent.  Although defendants are correct that, after the actuator or

lever (21) is moved from the downhill to the touring position, the user must depress the

brake platform in order to raise and lock the brakes, defendants' focus on this activity,

which occurs after, and not contemporaneously "with" the upper portion's transition from

the downhill to the touring position, is misplaced.  The claimed scope of the "brake

holder" involves the latching mechanism underneath and adjacent to the brake platform,

which changes configuration when the lever is switched between the downhill and

touring positions.  In the downhill mode, the hook (64) will not engage with the brake

platform, whereas in the touring mode, it "is rotated forward such that when the platform

is forced downward to raise brake arms 62 from the snow, latch portion 67 of brake link

65 will engage the hook and the brake platform will be retained in a position with brake

arm 62 elevated from the snow." *See* '728 Patent at Col. 14, Lines 30-40.  Contrary to defendants' premise, the brake holder (as opposed to the brake platform) does, in fact, "automatically" switch from a downhill (incapable of locking) to a touring (capable of locking) configuration.  The claim language "moveable in response to movement of the upper portion between the downhill and touring positions" adequately captures this concept, and defendants' attempt to incorporate an additional requirement that the brake platform be subsequently secured during a hands-free operation is improper.[4]

In addition, defendants' reliance on the theory of prior art disparagement is misplaced.  In a discussion of the prior art, the patentee indicated:

> The snow brake for the DYNAFIT[TM] binding is positioned to not contact snow while in the touring mode by the user forcing the heel plate of the brake downwards while simultaneously rotating the heel unit to a position in the touring mode.  This requires a two-handed or other dual motion activity on the part of the user, which can be difficult to accomplish while in deep snow or when poised in a precarious location.

'728 Patent at Col. 2, Line 32-39.  As with the "footwear attached" limitation defendants wanted to incorporate into other claim terms, defendants fail to identify a statement in the specification that rises to the requisite level of disparagement, and they point to no word or phrase actually appearing in the "brake holder" term of Claim 1 that must be construed in light of any disparagement of the prior art.  *See SciMed*, 242 F.3d at 1344 (claim construction "begins and ends in all cases with the actual words of the claim"); *compare Fenner Invs., Ltd. v. Cellco P'ship*, 778 F.3d 1320, 1323-26 (Fed. Cir. 2015) (affirming

---

[4] Defendants' proposed language is also illogical given the nature of the invention.  It attempts to exclude from claim scope only two-handed or dual motion activity, but the amount and direction of force required to depress the brake platform can be generated with only one hand and in a single motion.

the district court's ruling that, based on the specification and prosecution history, the term "personal identification number," in the context of personal communication services, meant the number associated with an individual, and not the number assigned to a particular device).  Defendants are simply attempting to create a limitation where none previously existed.

### 3.   Claim Construction Is Not Required

The Federal Circuit has recognized that "[w]ords are symbols, linguistic embodiments of information sought to be communicated, and, as such, can be imperfect at representing their subject." *Fenner*, 778 F.3d at 1323.  "Judicial 'construction' of patent claims aims to state the boundaries of the patented subject matter, not to change that which was invented." *Id.*; *see also Renishaw*, 158 F.3d at 1250 ("The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.").  With respect to the four claim terms at issue, defendants have not identified any word or phrase that inadequately or confusingly expresses the scope of the invention; rather, defendants seek to rewrite the language that received the United States Patent and Trademark Office's imprimatur.

The four claim terms at issue require no interpretation.  Although plaintiff has offered its own constructions, they merely restate the claim terms using slightly different sequences of the words in the claim terms and/or their synonyms.  The Court need not engage in a similar effort.  *See Ballard Med. Prods. v. Allegiance Healthcare Corp.*, 268 F.3d 1352, 1358 (Fed. Cir. 2001) ("*Markman* does not require a district court to follow

any particular procedure in conducting claim construction.  It merely holds that claim

construction is the province of the court, not a jury. . . .  As long as the trial court

construes the claims *to the extent necessary* to determine whether the accused device

infringes, the court may approach the task in any way that it deems best." (emphasis

added)); *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 502 F. Supp. 2d 568,

575-76 (E.D. Ky. 2007).[5]  The "upper portion," "complete movement," "single motions,"

and "brake holder" terms of Claims 1, 11, and/or 29 are entirely self-explanatory.

**Conclusion**

For the foregoing reasons, the Court DECLINES to further construe the disputed

claim terms.  The Court makes no ruling concerning whether the independent and/or

dependent claims of the '728 Patent "read on" the allegedly infringing devices.

IT IS SO ORDERED.

Dated this 25th day of August, 2016.

Thomas S. Zilly
United States District Judge

---

[5] In *Static Control*, the district court criticized one side's "exhortation to attach a synonym to self-defined and simple words" because it invited "a meaningless result that mocks the notion of construction."  502 F. Supp. 2d at 576.  The district court used as an example the term "dog," which a party might argue, in light of intrinsic evidence, must be construed as weighing less than 50 pounds.  *Id.* at 575.  Such party might also contend that its accused dog is non-infringing because it weighs more than 50 pounds.  According to the district court in *Static Control*, determining whether a "dog" has a maximum weight would be an exercise in claim construction.  *Id.*  On the other hand, deciding whether "dog" means "canine" is a pointless endeavor, prompting the query of how an accused "dog" would infringe but an accused "canine" would not.  *Id.*

ORDER - 22